RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0142P (6th Cir.)
File Name: 02a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KENTLAND ELKHORN COAL
CORPORATION,
                    *Petitioner,*

    *v.*

NOAH HALL; DIRECTOR,
OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT
OF LABOR,
                    *Respondents.*

No. 00-4470

On Petition for Review of an Order
of the Benefits Review Board,
United States Department of Labor.
No. 00-0186 BLA.

Argued: January 23, 2002

Decided and Filed: April 24, 2002

Before: JONES and COLE, Circuit Judges; GWIN, District
Judge.[*]

_____

[*] The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

————————————

**COUNSEL**

**ARGUED:** Lois A. Kitts, BAIRD & BAIRD, P.S.C., Pikeville, Kentucky, for Petitioner. Stephen A. Sanders, APPALACHIAN RESEARCH & DEFENSE FUND OF KENTUCKY, INC., Prestonburg, Kentucky, Mary Forrest-Doyle, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. **ON BRIEF:** Lois A. Kitts, BAIRD & BAIRD, P.S.C., Pikeville, Kentucky, for Petitioner. Stephen A. Sanders, APPALACHIAN RESEARCH & DEFENSE FUND OF KENTUCKY, INC., Prestonburg, Kentucky, Christian P. Barber, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Respondents.

————————————

**OPINION**

————————————

GWIN, District Judge. With this appeal, we decide whether the Benefits Review Board of the U.S. Department of Labor (the "Board") erred when it upheld an Administrative Law Judge's ("ALJ's") decision to award Respondent Noah Hall benefits under the Coal Mine Health and Safety Act, as amended by the Black Lung Benefits Act of 1977, 30 U.S.C. §§ 901–62 (1986) (the "Act"). We also decide whether the Benefits Review Board erred when it found Petitioner Kentland Elkhorn Coal Corporation ("Kentland") to be the responsible operator.

Petitioner Kentland Elkhorn appeals the decision of the Board granting Respondent Noah Hall, a coal miner, benefits under the Black Lung Benefits Act of 1977. Kentland alleges that the evidence did not support Hall's claim to benefits and that the Administrative Law Judge erred in finding Kentland the correct responsible operator. The Director, Office of

responsible operator. Further, Hall's entitlement to benefits has been fully litigated on its merits. Like the court in *Trace Fork*, we are unwilling to upset that finding.

This Court's decision in *Director, Office of Workers' Compensation Programs v. Oglebay*, 877 F.2d 1300 (6th Cir. 1989), is distinguishable from the present case. In *Oglebay*, this Court allowed the Director to identify a new responsible operator ten years after the filing of the initial claim. *See id.* at 1303. This Court allowed this in large part because "the claim had not, at that time, been finally adjudicated." *Id.* Additionally, because the new operator would both have access to the evidence developed in the case and a chance to challenge the claimant's entitlement to benefits, given that no hearing on the merits had yet taken place, the addition of a new operator would not prejudice the parties. *See id.* at 1304.

In the present case, however, Hall's claim has been fully litigated on its merits, and to allow further inquiry into the responsible operator issue would prejudice the parties. While we do not hold that a case can never be remanded to name a new operator, we do, however, hold that remand cannot come so late in the proceedings.

### IV.  Conclusion

We AFFIRM the ALJ's decision finding Hall entitled to benefits under the Black Lung Benefits Act. We REVERSE the ALJ's decision finding Kentland to be the proper responsible operator, and accordingly REMAND that issue to the Benefits Review Board for proceedings in accordance with this decision.

Workers' Compensation Programs, U.S. Department of Labor ("Director") joins this action as a Respondent party in interest.

Because there was substantial evidence to support the ALJ's determination that Hall is totally disabled because of pneumoconiosis ("black lung disease"), we AFFIRM the ALJ's decision on that issue. However, because the evidence was insufficient to conclude that Kentland was the responsible operator, we REVERSE and REMAND to the Benefits Review Board for proceedings in accordance with this decision.

### I.  Background

Noah Hall was born on June 5, 1941. He worked in coal mining for much of his adult life. Hall filed unsuccessful claims for benefits under the Black Lung Benefits Act in 1975, 1978, and 1984, the last of which the Director denied on October 13, 1995. By 1989, Hall says he experienced shortness of breath, chest pain, and difficulty walking long distances and climbing stairs. That same year, Hall suffered disabling injuries in a rock fall while working for Desparado Fuels, Inc. ("Desparado Fuels") and has not worked since then. (J.A. at 430, 435.)

On September 15, 1997, Hall again filed for benefits under the Black Lung Benefits Act. The Director initially denied this claim on January 22, 1998. The Director denied benefits at that time because Hall did not demonstrate that black lung disease totally disabled him. (J.A. at 211–16.) Hall appealed the decision. (J.A. at 217.) On July 22, 1998, the Director held an informal conference. In a proposed decision and order, the Director found that Hall did have black lung disease, that coal mine work caused the disease, that Hall timely filed his claim, that Hall had worked at least fifteen years in coal mines, that Kentland was the responsible operator in the claim, and that Hall's most recent period of cumulative coal mine employment totaling at least one year was with Kentland. The Director, however, denied Hall's

claim for benefits because he found that Hall did not show total disability, and because Hall had not shown a material change since the earlier denial of benefits. (J.A. at 243–54.)

On August 26, 1998, Hall requested a formal hearing. Having received Hall's request, the Department of Labor transferred Hall's claim to the Office of Administrative Law Judges for a hearing. On May 18, 1999, Administrative Law Judge, Thomas Phalen, Jr., convened a hearing to review Hall's claim.

In a September 30, 1999, decision, the ALJ awarded Hall black lung benefits. In that decision the ALJ found that Hall worked in coal mines for fifteen years (J.A. at 10), that Hall has coal workers' pneumoconiosis (J.A. at 18), that the pneumoconiosis arose out of Hall's work as a coal miner (J.A. at 18), that Hall is totally disabled because of the disease (J.A. at 17–19), and that such a finding of total disability is a "material change in conditions" from a prior denial of benefits under 20 C.F.R. § 725.309(d) (1999)[1] (J.A. at 17, 18.) The ALJ also found that Kentland was the responsible operator (J.A. at 10.) In selecting Kentland as the responsible operator, the ALJ found that Hall's more recent employers, Desparado and Coleman & Coleman Mining Company, Inc. ("Coleman"), were not responsible because they employed Hall for less than a cumulative year. (J.A. at 9.)

---

[1]On January 19, 2001, revisions to 20 C.F.R. pt. 725 became effective. *See* 20 C.F.R. § 725.2 (2001). According to 20 C.F.R. § 725.2, the revised procedures of part 725 apply to all claims pending on January 19, 2001, with certain exceptions. For the excepted sections, the Code of Federal Regulations directs that the version "revised as of April 1, 1999," be applied. 20 C.F.R. § 725.2(c). Many of the Code of Federal Regulations provisions at issue in this case fall under the exception, and thus the Court cites to the 1999 version when appropriate.

The current version of 20 C.F.R. § 718.2 explains the applicability of part 718 of the Code of Federal Regulations to pending cases. It states that "[t]his part is applicable to the adjudication of all claims filed after March 31, 1980 . . . ." 20 C.F.R. § 718.2 (2002). Therefore, the Court applies the current version of part 718 to this case.

not be definitively identified." *Trace Fork*, 67 F.3d at 506. Further, the Fourth Circuit upheld the Board's decision not to remand the case for the appointment of another responsible operator. *See id.* at 508. The court in *Trace Fork* stated that

> the Director must resolve the responsible operator issue in a preliminary proceeding, or else proceed against all potential operators at each stage of the claim adjudication, to prevent piecemeal litigation and avoid due process concerns. If this case were remanded and another responsible operator named, that operator would be entitled to challenge [the claimant's] entitlement to benefits. We are unwilling to potentially upset the finding that [the claimant] is entitled to benefits, a matter already fully litigated on the merits.

*Id.* at 508 (internal citation omitted).

In *Venicassa*, the Third Circuit also refused to allow the further consideration of the responsible operator issue. It upheld the assignment of liability to the Trust Fund, because the Director "did not make a timely designation of the proper responsible operator, nor did it even make a timely attempt to correct its misdesignation or to add [other] potential responsible operator[s] . . . ." *Venicassa*, 137 F.3d at 203.

The *Venicassa* court found it significant that the Director had sufficient evidence from early in the proceedings to name the proper responsible operator, and yet did not set forth information sufficient to identify the responsible operator. *See id.* at 202. In deciding that the case should not be remanded, the court found it significant that the claim had already been fully adjudicated on it its merits. *See id.*

In the present case, the Director has similarly failed to develop adequate evidence regarding the designation of a responsible operator. Because the Director did not offer evidence substantial enough to show that Grassy Creek could not be held responsible as a successor to Coleman, the Director failed to show that Kentland was the proper

to which one is properly responsible for benefits, in one proceeding. We hold, however, that due process, as well as the efficient administration of the Act, compels this result.

 Remand for reconsideration of the operator issue would be tantamount to relitigating the claim. If the Department identifies another responsible operator, then that operator is entitled to contest the claim, develop its own evidence, request a hearing, *etc.*, until it has exhausted the full gamut of available procedures for adjudicating entitlement. . . . This piecemeal approach encourages two undesirable results. First, a claimant who has established entitlement in the first round of proceedings may lose his award in a later round against another operator. . . . Second, piecemeal litigation obviously is not compatible with the efficient administration of the Act and expeditious processing of claims.

*Id.* at 1-357 (footnote omitted).

Though we are not bound by the Board's decision in *Crabtree*, it is nevertheless persuasive because of the factual similarities. In *Crabtree*, the Board refused to remand for further consideration of the operator issue because the Director had ample opportunity to develop evidence about the proper responsible operator and failed to do so. Further, the claim had been adjudicated on its merits at the time the Board reviewed the ALJ's decision. Therefore, the Board decided that "the Department must resolve the operator issue in a preliminary proceeding, and/or proceed against all putative responsible operators at every stage of the claims adjudication." *Id.* at 1-357 (internal citation omitted).

Other circuits have followed the reasoning of *Crabtree* in similar circumstances. In *Trace Fork*, the Fourth Circuit held that the Board properly dismissed Trace Fork as the responsible operator because the Director "inadequately developed the evidence so that the responsible operator could

Kentland appealed the ALJ's decision to the Benefits Review Board. The Board affirmed the ALJ's decision designating Kentland as the responsible operator and finding Hall entitled to black lung benefits. (J.A. at 27, 29.) Kentland now appeals to this Court.

## II. Standard of Review

This Court must affirm the Board's decision if the Board has not committed any legal error or exceeded its scope of review of the ALJ's determination. *See Glen Coal Co. v. Seals*, 147 F.3d 502, 510 (6th Cir. 1998). The Court reviews the ALJ's decision only to decide whether substantial evidence supports it, and whether it is in accordance with the applicable law. *See id.* We do not reweigh the evidence or substitute our judgment for that of the ALJ. *See Gray v. SLC Coal Co.*, 176 F.3d 382, 387 (6th Cir. 1999). Thus, as long as the evidence supports the ALJ's conclusions, the Court will not reverse the ALJ's decision, "even if the facts permit an alternative conclusion." *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995).

We review issues of law de novo. *See Creek Coal Co. v. Bates*, 134 F.3d 734, 737 (6th Cir. 1997).

Petitioner Kentland raises two issues on appeal. First, Kentland claims that the ALJ erred in finding Hall totally disabled because of black lung disease. Second, Kentland claims that the ALJ erred in finding Kentland to be the responsible operator.

## III. Discussion

### A. Total Disability Due to Black Lung Disease

Hall filed his present claim in 1997, more than one year after the final denial of an earlier claim in 1995. Hall's present claim is, therefore, a duplicate of an earlier claim rather than a request for modification. According to 20 C.F.R. § 725.309(d) (1999), "if the earlier . . . claim has been

finally denied, the later claim shall also be denied, on the grounds of the prior denial, unless . . . there has been a material change in conditions . . . ." To find that a material change in condition has occurred, the ALJ

> must consider all of the new evidence, favorable and unfavorable, and determine whether the miner has proven at least one of the elements of entitlement previously adjudicated against him. If the miner establishes the existence of that element, he has demonstrated, as a matter of law, a material change. Then the ALJ must consider whether all of the record evidence, including that submitted with the previous claims, supports a finding of entitlement to benefits.

*Sharondale Corp. v. Ross*, 42 F.3d 993, 997–98 (6th Cir. 1994). The ALJ's conclusion that Hall is now totally disabled because of black lung disease established a material change in condition.

On appeal, Kentland challenges only whether Hall is totally disabled. It does not challenge that Hall suffers from black lung disease, that his disease arose from mining employment, or that the total disability is the result of black lung disease. We accordingly limit our review to the question of whether substantial evidence supports the ALJ's finding that Hall is totally disabled because of black lung disease.

Section 718.204 defines "total disability." *See* 20 C.F.R. § 718.204(b)(1) (2002). To show "total disability," a miner must show that his disease prevents him from "performing his . . . usual coal mine work," and prevents him "[f]rom engaging in gainful employment in the immediate area of his . . . residence requiring the skills or abilities comparable to those of any employment in mine or mines in which he . . . previously engaged with some regularity over a substantial period of time." 20 C.F.R. § 718.204(b)(1)(i), (ii) (2002). The regulations then list a series of five medical criteria under

recent periods of cumulative employment of not less than 1 year . . . ." 20 C.F.R. § 725.493(a)(1) (1999). We do not, however, remand this case to name a new responsible operator or for further inquiry as to whether Kentland is in fact the proper responsible operator.

The regulations require that the Director identify, notify, and develop evidence regarding potential responsible operators. *See* 20 C.F.R. §§ 725.410(b), 725.412 (1999). When the Director has failed to develop this evidence adequately or has failed to resolve the responsible operator issue at a preliminary stage of the case, courts have refused to remand the case for further proceedings regarding the responsible operator. Instead, the Black Lung Disability Trust Fund ("Trust Fund") has paid the benefits to which the miners were entitled. *See, e.g.*, *Venicassa v. Director, Office of Workers' Comp. Programs*, 137 F.3d 197 (3d Cir. 1998); *Director, Office of Workers' Comp. Programs v. Trace Fork Coal Co.*, 67 F.3d 503 (4th Cir. 1995); *Crabtree v. Bethlehem Steel Corp.*, 7 Black Lung Rep. 1-354 (Ben. Rev. Bd. 1984).

In *Crabtree*, the Board reviewed the ALJ's decision granting benefits to the claimant and finding Bethlehem Steel to be the proper responsible operator. The Board reversed the ALJ's finding that Bethlehem Steel was the responsible operator and refused to remand the case for reconsideration of the operator issue. *Crabtree*, 7 Black Lung Rep. at 1-355, 1-356. The Board, instead, held the Trust Fund liable, stating that "[t]he Department of Labor is not entitled to a second opportunity to identify another putative responsible operator." *Id.* at 1-356. The Board further explained:

> The Department is authorized by law to identify the putative responsible operator who may be liable for payment of benefits, in the course of determining whether a miner is entitled to benefits. 20 C.F.R. §§ 725.410, 725.412. The regulations contain no express provision requiring the Department to identify all putative responsible operators, and resolve any dispute as

Security statement of earnings shows that he worked for Coleman for periods of time in 1980 and 1981. In 1980, Hall earned $4706.27 from Coleman, and in 1981, he earned $5465.35. His earnings from Coleman indicate that if his time with Coleman and Grassy Creek were aggregated, it would total over a year.

Because substantial evidence does not support the ALJ's conclusion regarding the predecessor/successor relationship of Coleman and Grassy Creek, the evidence also does not support a finding that Kentland is the proper responsible operator.[7]   Kentland could only be liable as a responsible operator if no other subsequent operators employed Hall for a year or more. The evidence is not substantial enough to support a finding that Grassy Creek cannot be held responsible. Instead, the evidence indicates that Grassy Creek is likely the "operator . . . with which [Hall] had the most

---

[7]The Director, as a party in interest, does not argue that Coleman and Grassy Creek are not in a predecessor/successor relationship. Rather, the Director argues that neither company can be a responsible operator because neither employed Hall for at least one year. The Director argues that the language in 30 U.S.C. § 932(i) of the Act directing that successor operators are to pay benefits that "would have been payable by the prior operator," means that no liability can attach to a successor unless it attached to the prior operator. In other words, the Director argues that unless the prior operator employed the miner for a year, the one-year clock resets for the successor when its predecessor sells all of its assets and transfers all of its employees.

The Director, however, fails to complete the sentence from the statute. The Act states that the successor is liable for all "benefits which would have been payable by the prior operator under this section with respect to miners previously employed by such prior operator *as if the acquisition had not occurred and the prior operator had continued to be an operator of a coal mine.*" 30 U.S.C. § 932(i)(1) (emphasis added). The Act contemplates that the successor's identity will merge with that of its predecessor. This construction makes sense because the purpose of the Act is to prevent clever corporate structures from defeating the protections of the Act. If we adopt the Director's argument, then a company could escape liability under the Act by forming a shell corporation and transferring its assets into the shell every eleven months. This is exactly the strategy the Act intends to avoid.

20 C.F.R. § 718.204(b)(2) (2002) that can establish a miner's total disability.

The ALJ found that Hall had shown himself totally disabled under 20 C.F.R. § 718.204(b)(2)(iv) by showing that "a physician exercising reasoned medical judgment, based on medically acceptable clinical and laboratory diagnostic techniques, concludes that a miner's respiratory or pulmonary condition . . . prevents the miner from engaging in employment as described in paragraph (b)(1) of this section." (J.A. at 16.)

In making this determination, the ALJ considered four doctors' evaluations of Hall. (J.A. at 12–14.) In choosing which evaluations were more credible, the ALJ recognized that by finding a material change in condition, the ALJ was required to consider all of the evidence of record. In considering such evidence, the ALJ determined that because black lung is "a progressive and irreversible disease," it is "appropriate to accord greater weight to the most recent evidence of record, especially where a significant amount of time separates the newer from the older evidence." (J.A. at 18.)   Accordingly, the ALJ focused on the evaluations performed by Drs. Sibu Saha, Mann Younes, Ayesha N. Sikder, and Gregory Fino. (J.A. at 12–14.)

Dr. Saha conducted a biopsy of Hall's lung and found a pleural nodule in August 1994. The discharge diagnosis of Hall showed "anthracosilicosis of the left lung" and "tobacco abuse." (J.A. at 156–57.)

Dr. Younes examined Hall on October 3, 1997. He diagnosed Hall with coal workers' pneumoconiosis, causally related to occupational dust exposure, chronic obstructive pulmonary disease, and chronic bronchitis. He traced the second and third ailments primarily to cigarette smoking and secondarily to coal dust exposure. (J.A. at 200–01.) On one part of the evaluation form, Dr. Younes stated that Hall had a "moderate obstructive impairment which may interfere with

last coal mining job." (J.A. at 201.) But Dr. Younes also said that Hall's impairment rendered Hall totally disabled from coal mining employment. (J.A. at 202.) The doctor also noted that Hall's impairment "is primarily caused by smoking tobacco but occupational dust exposure may also be a contributing factor." (J.A. at 202.)

Dr. Sikder began treating Hall in 1997. In her January 1998 examination of Hall, Dr. Sikder concluded that Hall had black lung disease based on coal dust exposure and chest X rays that revealed fibrotic lung disease. Dr. Sikder concluded that silica and coal dust exposure caused the disease and rendered Hall totally disabled and thus unable to work.[2] (J.A. at 219–20.)

Kentland argues that the ALJ should have relied upon Dr. Fino and should have discounted the opinions of Drs. Sikder, Younes, and Saha. Dr. Fino examined Hall on June 2, 1998. He did a chest X ray, a pulmonary function test, and an arterial blood gas study. Dr. Fino gave the opinion that Hall had black lung disease, that the breathing obstruction was related to smoking, but that "the degree of obstruction cannot be assessed since [Hall] did not give a maximum effort." (J.A. at 229.) He concluded that "[t]here is no evidence that the obstruction is of significant degree to prevent [Hall] from returning to his last job or a job requiring similar effort." (J.A. at 229.)

The ALJ found that the opinions of Drs. Saha, Younes, and Sikder outweighed the opinion of Dr. Fino. The ALJ found Dr. Fino's evidence to be equivocal and vague. Particularly troubling to the ALJ was that Dr. Fino could not sufficiently determine the level of obstruction of Hall's lungs, yet he still

---

[2] While Dr. Sikder initially answered "yes" to the question of whether Hall retained the respiratory capability to perform his usual coal mine work, the doctor indicated in a subsequent note that she "wrote yes by mistake." (J.A. at 220.) The note further stated about Hall's usual coal mine work that "P[atient] unable to perform above work." (J.A. at 220.)

---

The ALJ dismissed this evidence in one sentence, stating that there was "no evidence regarding a mine acquisition or a transfer of assets." (J.A. at 10.) It seems apparent, however, that moving all of the equipment from one mine to another mine, and operating it under a different name or corporate structure, would qualify as a "transfer of assets," even if there were no written purchase agreement or other documentation facilitating the transfer. This and other record evidence shows that the preponderance of the evidence likely establishes that Grassy Creek was a successor to Coleman.

A preponderance of the evidence likely supports a finding that Coleman and Grassy Creek were in a predecessor/successor relationship. Therefore, if the aggregated time Hall worked for each company totaled one year, then Grassy Creek, and not Kentland, would be the proper responsible operator. *See, e.g., C&K Coal Co. v. Taylor*, 165 F.3d 254, 257 (3d Cir. 1999) (aggregating the time a miner worked for the predecessor and successor companies to determine whether his employment exceeded the one-year requirement).[6]

Hall worked for Grassy Creek from July 27 or 30, 1981, to July 22, 1982, just under a year. (J.A. at 97, 130.) Hall does not know how long he worked for Coleman. His Social

---

operate under the same name, but "they took all their men with them," and the employees worked with the same people at Grassy Creek as they did at Coleman. (J.A. 423–24.)

[6] The Director relies on *C&K Coal Co. v. Taylor*, 165 F.3d 254 (3d Cir. 1999), for the proposition that a successor cannot be liable for benefits unless the predecessor company would have been liable. (Director's Br. at 19, 21.) In *C&K Coal*, however, the court aggregated the total time the predecessor and successor companies employed the miner and noted that according to 30 U.S.C. § 932(i)(1), "the successor operator is responsible for benefits which 'would have been payable' by the prior operator for miners previously employed by the prior operator as if the prior operator had continued to operate the mine." *C&K Coal*, 165 F.3d at 257.

conditions] . . . the successor operator shall, if appropriate, be liable for the payment of such benefits.

20 C.F.R. § 725.493 (a)(2)(ii) (1999).

The ALJ found that Coleman and Grassy Creek were not in a predecessor/successor relationship, and therefore Kentland was the appropriate responsible operator. (J.A. at 10.) We reverse the ALJ's decision only if substantial evidence does not support the conclusion or the conclusion is not in accordance with the law. *See Youghiogheny*, 49 F.3d at 246. Here, substantial evidence does not support the ALJ's conclusion that Coleman and Grassy Creek were not in a predecessor/successor relationship. Rather, the preponderance of the evidence supports the contrary.

Brent Coleman, one of the three incorporators of Coleman & Coleman, was also the sole incorporator of Grassy Creek. (J.A. at 102–05, 98–101.) Similarly, Brent Coleman was a director of Coleman & Coleman and the sole director of Grassy Creek. (J.A. at 100, 104.) Grassy Creek's bookkeeper supplied information regarding Hall's periods of employment with both companies. (J.A. at 130.) She worked out of the same office for both Coleman & Coleman and Grassy Creek. (J.A. at 130, 152–53.) Roger Coleman, an incorporator and director of Coleman & Coleman, signed an affidavit in 1991 as custodian of Grassy Creek's records. (J.A. at 67.) Hall testified twice that Coleman & Coleman and Grassy Creek had the same owners but different mine sites. (J.A. at 93, 421.) Hall also testified that when they finished mining one site, the employees would move the equipment to another mine and operate it under a different name.[5] (J.A. at 422.)

---

[5] Hall testified in a hearing before ALJ Phalen that when Coleman moved from one mine to another, "[t]hey were moving the mining equipment. They was taking their equipment with them. When they quit one mine, they took all their equipment out of it. They moved it over here to another mine, then used the equipment in it." (J.A. at 423.) Hall stated further that when Coleman moved mine sites, they would not necessarily

concluded that Hall could do his previous coal mine work. (J.A. at 16–17.) In contrast, the ALJ noted that Drs. Younes and Sikder had both done a thorough examination of Hall and indicated that he was completely unable to do mining work. (J.A. at 17.) Combined with the fact that Hall's previous work in the coal mines required heavy exertion and exposure to large amounts of dust (J.A. at 381, 384–86), the ALJ concluded that Hall was totally disabled as 20 C.F.R. § 718.204(b)(1) defines that term.

Beyond proving that he is totally disabled, Hall must also show that the black lung disease is a "substantially contributing cause" of the totally disabling impairment to receive benefits under the Black Lung Benefits Act. *See* 20 C.F.R. § 718.204(c)(1) (2002). We have held that black lung disease need not cause the totally disabling impairment solely, but the impairment must be due "at least in part" to black lung disease. *Adams v. Dep't of Labor*, 886 F.2d 818, 825 (6th Cir. 1989).

The ALJ found that the opinions of Drs. Younes and Sikder were sufficient to find that Hall's impairment was either primarily or secondarily related to his exposure to coal dust. The ALJ found this despite the fact that Hall's cigarette smoking may have also been a contributing factor. (J.A. at 19.)

In this appeal, Kentland essentially argues that the ALJ did not give adequate weight to Dr. Fino's medical opinion. We reject this argument. As stated previously, we are not called upon to reweigh the evidence or substitute our judgment for that of the ALJ. *See Gray*, 176 F.3d at 387. We review only whether the ALJ's evaluation was unreasonable or not according to law. The ALJ found the opinions of Drs. Saha, Younes, and Sikder more credible than Dr. Fino's opinion. We find that the ALJ's evaluation of the record evidence was reasonable and in accordance with the law, and that the ALJ based the evaluation upon substantial evidence in the record.

We therefore find that substantial evidence supports Hall's eligibility for black lung benefits.

### B.  Responsible Operator

Having decided that Hall is entitled to benefits, we must now decide who is responsible for paying these benefits.  The Act puts the burden of payment on employers.  *See* 30 U.S.C. § 932 (1986).  If no employer is found liable, the payment obligation falls to the Black Lung Disability Trust Fund.  *See* 26 U.S.C. § 9501 (1989).

Federal regulations create a framework in which to decide the employer responsible for payment of a miner's black lung benefits.  The "responsible operator" is the employer "with which the miner had the most recent periods of cumulative employment of not less than 1 year."    20 C.F.R. § 725.493(a)(1) (1999); *see also Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 573 n.1 (6th Cir. 2000).

Section 725.493(b) outlines the method for determining the responsible operator.  That section states:

From the evidence presented, the identity of the operator or other employer with which the miner had the most recent periods of cumulative employment of not less than 1 year and, to the extent evidence permits, the beginning and ending dates of such periods, shall be ascertained.  For purposes of this section, a year of employment means a period of 1 year, or partial periods totaling 1 year, during which the miner was regularly employed in or around a coal mine by the operator or other employer. Regular employment may be established on the basis of any evidence presented, including the testimony of the claimant or other witnesses, and shall not be contingent upon a finding of a specific number of days of employment within a given period.  However, if an operator or other employer proves that the miner was not employed by it for a period of at least 125 working days, such operator or other employer shall be

(1)  During  any  period  in  which  this  section  is applicable to the operator of a coal mine who on or after January 1, 1970, acquired such mine or substantially all the assets thereof, from a person (hereinafter in this subsection referred to as a "prior operator") who was an operator of such mine, or owner of such assets on or after January 1, 1970, such operator shall be liable for and shall . . . secure the payment of all benefits which would have been payable by the prior operator under this section with respect to miners previously employed by such prior operator as if the acquisition had not occurred and the prior operator had continued to be an operator of a coal mine.

(2) Nothing in this subsection shall relieve any prior operator of any liability under this section.

30 U.S.C. § 932(i)(1)–(2) (1986).

The Act further states that corporate reorganizations and liquidations qualify as such a relationship.  It places the burden to pay benefits on the successor operator if such successor operator purchases "substantially all [of the prior operator's] assets," or if a prior operator ceases to exist "as the result of a merger, consolidation, or division."  30 U.S.C. § 932(i)(30)(A)–(D).

The Code of Federal Regulations discusses the motive of the statute, explaining that

The stated congressional objective supporting [30 U.S.C. § 932(i)] is to prevent a coal operator from circumventing liability under this part by entering into corporate or other business transactions which make the assessment of liability against that operator a financial or legal impossibility.  Accordingly, a prior operator . . . which transfers a mine or mines or substantially all the assets thereof, shall remain primarily liable for the payment of benefits under this part . . . [and if the prior operator  cannot  meet  the  requisite  financial

determined to have established that the miner was not regularly employed for a cumulative year by such operator or employer for the purposes of paragraph (a) of this section. A "working day" means any day or part of a day for which a miner received pay for work as a miner.

20 C.F.R. § 725.493(b) (1999).

In an attempt to make sense of what is arguably an opaque regulation, the Third Circuit stated:

As a practical matter, the one-year employment requirement sets a floor for the operator's connection with the miner, below which the operator cannot be held responsible for the payment of benefits. The 125-day limit relates to the minimum amount of time the miner may have been exposed to coal dust while in employment by the operator.

*Director, Office of Workers' Comp. Programs v. Gardner*, 882 F.2d 67, 69–70 (1989).[3]

The parties do not dispute that Hall worked at Kentland for three years, from 1970 to 1973. Unless some later operator employed Hall for at least one year, Kentland is the

---

[3]This Court, in an unpublished opinion, reaches a conclusion similar to that of the Third Circuit in *Director, Office of Workers' Comp. Programs v. Gardner*, 882 F.2d 67, 69–70 (1989). In *BGL Mining Co. v. Cash*, No. 97-4003, 1998 WL 639171 (6th Cir. Sept. 11, 1998) (unpublished table decision), this Court recognizes two requirements to determine a responsible operator: First, "the miner must have been employed by the employer for not less than one year," and second, "during the one-year period the miner must have been employed for at least 125 'working days' in order for the employment to be deemed regular." *BGL Mining Co.*, 1998 WL 639171, at **3. Like the Third Circuit explained, the miner must work at least a year. Upon determining that the miner has worked for a cumulative period of one calendar year, the employer nevertheless will not be liable as a responsible operator unless during that one-year period, the employee worked as a miner for at least 125 days.

---

for work as a miner. *See Gardner*, 882 F.2d at 70 ("The 125-day limit relates to the minimum amount of time the miner may have been exposed to coal dust while in employment by that operator.").

Desparado Fuels, therefore, cannot be the responsible operator because it did not employ Hall for the minimum amount of time the regulations require.

### 2. Coleman & Coleman and Grassy Creek Energies

Kentland next argues that Hall worked for two companies, Coleman and Grassy Creek, after his employment with Kentland. Kentland argues that the ALJ erred in not finding a predecessor/successor relationship between the two companies. If such a predecessor/successor relationship is found, Kentland says the ALJ should have aggregated the time Hall worked for each.

The Director and Hall concede that Hall began working for Coleman on September 8, 1980, but neither knew his length of employment. (J.A. at 80.) The director and Hall also concede that Hall worked for Grassy Creek from July 27 or 30, 1981, to July 22, 1982. (J.A. at 97, 130.) Therefore, we decide whether it was rational to conclude that Coleman and Grassy Creek were not in a predecessor/successor relationship, but if they were, whether the time Hall spent at both companies should be aggregated.[4]

Section 932(i) of the United States Code outlines the liability of subsequent operators. It states that

---

[4]The Director argues that even if Grassy Creek had a successor interest in Coleman, Hall did not work for Coleman for a year, and therefore Grassy Creek cannot be held liable as a responsible operator. The Director advanced this argument below, but the Board did not consider it in its opinion.

responsible operator.   Kentland objects to the ALJ's determination that it was the responsible operator on three grounds.  First, it argues that the ALJ failed accurately to calculate the time that Hall worked at another mining company, Desparado Fuels, because the ALJ did not include the time that Hall was on disability leave after an injury at Desparado Fuels. Second, Kentland argues that another mine, Coleman, along with its alleged successor Grassy Creek Energies, Inc. ("Grassy Creek"), employed Hall for more than one year. Finally, Kentland argues the ALJ applied the wrong legal standard regarding who bore the burden of finding all potentially responsible operators.  Kentland says the ALJ wrongly placed that burden upon it instead of upon the Director.

We review the factual record to decide whether substantial evidence supports the ALJ's decision that Kentland is the responsible operator. *See Gray*, 147 F.3d at 387.  We review issues of law de novo. *See Bates*, 134 F.3d at 737.

### 1. Desparado Fuels

Hall worked at Desparado Fuels from March 6, 1989, to July 7, 1989.  He was injured on the job in a rock fall, and he drew disability benefits from July 8, 1989, until June 12, 1990.  The question with regard to Desparado Fuels is whether the one-year term of "regular employment" includes both the time Hall received wages from Desparado Fuels and the time he received disability payments.  *See* 20 C.F.R. § 725.493(b) (1999).

Kentland relies upon *Boyd v. Island Creek Coal Co.*, 8 Black Lung Rep. 1-458 (Ben. Rev. Bd. Jan. 31, 1986), a Benefits Review Board case. In *Boyd*, a claimant worked for ten and one-half months, was intermittently on leave for a back injury, but accrued an additional fifty days of work from the time he injured his back to the time he finally resigned. The Board found that Island Creek Coal was the responsible operator and that Island Creek Coal could not escape liability

by failing to count the "down time" from the claimant's injury to his final resignation.

The ALJ distinguished *Boyd*, stating that in *Boyd*, "the miner continued to work for the employer after the work injury and was kept on the payroll during the time he was injured; this time culminated in a continuous year of employment." (J.A. at 10.)  Hall, on the other hand, quit working for Desparado Fuels after his injury, and thus did not remain on the payroll for even 125 days, let alone the year required by 20 C.F.R. § 725.493(b) (1999).

Kentland argues that no evidence shows Desparado Fuels took Hall off the payroll after his injury, only that Desparado Fuels did not have a time sheet for Hall's physical presence after his injury.  This is wrong.  The bookkeeper for Desparado Fuels submitted evidence showing that Hall was not on the payroll for the required one-year period. (J.A. at 64–65.)  Speculation as to whether Hall remained on the payroll is not evidence that he was on the payroll. Furthermore, even if Hall had worked in the mines every day during the period in which he was on the payroll at Desparado Fuels, from March 6, 1989, to July 7, 1989, those dates would only equal 124 days—indisputably less than the required 125 days under 20 C.F.R. § 725.493(b).

Additionally, the regulations require that the miner work for an employer for a period of a year, with the miner receiving pay for at least 125 days of that period for "work as a miner." 20 C.F.R. § 725.493(b) (1999) (stating that "if . . . the miner was not employed . . . for a period of at least 125 working days, such operator or employer shall be determined to have established that the miner was not regularly employed for a cumulative year," and further stating that "[a] 'working day' means any day or part of a day for which a miner received pay for work as a miner.").

It strains the plain language of the regulation to assert that the disability benefits Desparado Fuels paid to Hall were pay